UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DENNIS E. MENTZOS, II,

Plaintiff,

v.

RICK HARRY,
ANITA SCHLANK,
DEBBIE JAMES and
DEBORAH KONIESKA,

Defendants.

Civil File No. 02-384 (MJD/AJB)

**REPORT AND RECOMMENDATION**

Plaintiff, a civilly committed sex offender, is seeking relief under 42 U.S.C. § 1983 for alleged violations of his federal constitutional rights. He is attempting to sue four state employees who work with the Minnesota Sex Offender Program, ("MSOP"). Defendants have filed a Fed. R. Civ. P. 12(b)(6) motion, contending that this action should be summarily dismissed because Plaintiff's complaint fails to state a cause of action on which relief can be granted. (Docket No. 5.)

This matter has been referred to the undersigned Magistrate Judge of the District Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, it will be recommended that Defendants' motion to dismiss be granted in part and denied in part.

## I. BACKGROUND[1]

Sometime in the mid-1990s, Petitioner was civilly committed as a "Sexually

[1] For purposes of resolving Defendants' motion, the Court must accept the factual allegations set forth in Plaintiff's pleading. (See "Standard of Review," pp. 5-6, infra.) Therefore, the following summary of the background of this case is based on the facts alleged in the complaint, (Docket No. 1), except as otherwise noted.

FILED DEC 2 0 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

Dangerous Person" under Minnesota law. See Minn. Stat. § 253B.185. The Minnesota Court of Appeals upheld Petitioner's commitment in a 1996 decision, In re: Mentzos, No. C3-95-2331 (Minn.App. 1996), 1996 WL 81721 (unpublished opinion).

The state appeals court noted that Petitioner "has a history of violent behavior," and that he was found to have "committed sexual misconduct against at least thirteen women." Id. at * 4. The record before the Court of Appeals indicated that Petitioner had sexually assaulted several girls who were in their early teens, (id. at * 1); that he had stalked an ex-girlfriend and "distributed nude photographs of her with her address and phone number," (id.); and that "even while incarcerated, [Petitioner] contacted another young woman, lied [to her]..., and asked her to date him," (id. at * 4).

Plaintiff's present lawsuit stems from a series of events that occurred at the MSOP treatment facility where he is being detained and treated pursuant to his civil commitment. In early December 2001, Defendant Rick Harry, the Chief Operating Officer of the MSOP, received a telephone call from the police department for San Jose, California. The police informed Harry that they believed Plaintiff had been calling a young teenage girl who apparently lives in the San Jose area. The police further indicated that they believed Plaintiff had been talking to the girl about sex, that he had sent presents to the girl, and that he had persuaded the girl to send him photographs of herself in the nude. Defendant Harry apparently passed along this information to Defendants Anita Schlank, the MSOP Clinical Director, and Deborah Konieska, an MSOP Behavior Analyst.

On December 7, 2001, Schlank and Konieska met with Plaintiff and advised him of the report that had been received from the San Jose police. They asked Plaintiff what he knew about the matter and encouraged him respond to the police accusations. Plaintiff told

Schlank and Konieska that they had no proof to support the accusations against him, that he wanted an attorney to be present when he responded to the accusations, and that he would not say anything more about the matter at that time.

Thereafter, Schlank and Konieska allegedly took several actions against Plaintiff based on the report that Harry had received from the San Jose police. First, they allegedly placed Plaintiff in segregated "protective isolation" for an unspecified term, and they restricted some of his institutional privileges for three days. The complaint does not clearly describe these various restrictions, and in fact, it is not even entirely clear that they actually were imposed. The complaint merely alleges that Plaintiff was told "you are being placed in seg PI [protective isolation] and then level A for two days followed by level B for one day." (Complaint, p. 7.)

Schlank and Konieska also allegedly imposed certain restrictions on Plaintiff's use of the telephone and mail service. Under those restrictions, Plaintiff has been allowed only two outgoing and incoming phone calls per day, and all of his calls must be monitored by an MSOP staff member. He also is required to speak only in English when he uses the phone, so his calls can be properly monitored. Under the mail restrictions, all of Plaintiff's incoming and outgoing mail is inspected by an MSOP staff member, and incoming mail from San Jose is subject to seizure and rejection.

Plaintiff's complaint describes two specific occasions when the mail restrictions were enforced by Defendant Debbie James, an MSOP social worker. Plaintiff alleges that on December 28, 2001, James called him into her office to discuss a piece of incoming mail addressed to him. James directed Plaintiff to open the mail in her presence, and she apparently intended to examine the contents of the mail. Plaintiff pointed out that the letter

was from Maryland (not San Jose), and he refused to open it. He asked James to return the mail to the person who had sent it, but James refused to do that. Instead, James simply retained possession of that piece of mail, and, according to Plaintiff, she still has it.

On January 2, 2002, Plaintiff was again summoned to James's office, this time to discuss an outgoing letter that Plaintiff wanted to mail. James asked Plaintiff to open the envelope so she could see its contents, but Plaintiff refused. He told James that the letter had "already been searched, scanned, read etc.," (Complaint, p. 4), and that he was not going to reopen the envelope after it had been sealed. At that point, James allegedly ripped up and destroyed the letter in Plaintiff's presence.

Plaintiff also alleges that on two occasions in January 2002,[2] James told him that she was presently "too busy" to allow him to make a "legal telephone call" that he was requesting. There are no allegations suggesting that there was anything urgent about the call that Plaintiff wanted to make, and there are no allegations suggesting that Plaintiff was not ultimately allowed to make the call.

In his present lawsuit, Plaintiff is claiming that Defendants violated his federal constitutional rights as follows:

(1) that Defendants Schlank and Konieska violated his right to due process by placing him in protective isolation, and imposing "level A and B" restrictions on him, without affording him the benefits of due process;

(2) that Defendants Schlank and Konieska violated his constitutional rights under the First Amendment and the Due Process Clause by restricting his telephone and mail

---

[2] The complaint actually states that these events took place in January 2001, but that presumably is a typographical error.

privileges;

(3) that Defendants Schlank and Konieska deprived him of his Fifth Amendment privilege against self-incrimination by first asking him what he knew about the girl in San Jose, and then imposing the protective isolation restriction, the "level A and B" restrictions, and the mail and telephone restrictions;

(4) that Defendant Harry violated his constitutional rights by approving the allegedly unconstitutional actions of Schlank and Konieska;

(5) that Defendant James violated his constitutional rights by not letting him place a legal telephone call on the two particular occasions described in the complaint; and

(6) that Defendant James violated his right to due process by withholding one piece of mail, and destroying another piece of mail, as described in the complaint.

Defendants contend that none of Plaintiff's claims is legally viable, and that the complaint should therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). The Court agrees that Plaintiff's first five claims (as listed above) must be dismissed. However, Defendants have not adequately explained why the final claim, (regarding James's alleged treatment of Plaintiff's mail), should be dismissed, and the Court will therefore recommend that Defendants' motion be denied as to that claim.

**II. STANDARD OF REVIEW**

Defendants' motion to dismiss Plaintiff's complaint is brought under Fed. R. Civ. P. 12(b)(6). A complaint will be dismissed pursuant to that Rule "'if it is clear that no relief can be granted under any set of facts that could be proved consistent with allegations'" that have been pleaded. Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995), quoting Alexander v. Peffer, 993 F.2d 1348, 1349 (8th Cir. 1993) and Hishon v. King & Spalding,

467 U.S. 69, 73 (1984). In assessing a motion brought under Rule 12(b)(6), a court must liberally construe a pro se complaint. Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). The court must "review the complaint most favorably to the non-moving party," bearing in mind that "[c]ivil rights pleadings should be construed liberally." Frey, 44 F.3d at 671. The complaint will not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Holloway v. Lockhart, 792 F.2d 760, 761-62 (8th Cir. 1986).

The court also "must presume that the factual allegations of the complaint are true and accord all reasonable inferences from those facts to the non-moving party." Id.; see also Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). This does not mean, however, that the court must accept the legal conclusions set forth in the plaintiff's complaint. Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990) (the court does not "blindly accept the legal conclusions drawn by the pleader from the facts"). Conclusory allegations -- that is, allegations that are simply legal conclusions unsupported by specific factual allegations -- are not sufficient to state an actionable claim for relief. Frey, 44 F.3d at 671 ("[a]t the very least... the complaint must contain facts which state a claim as a matter of law and must not be conclusory"); Martin v. Aubuchon, 623 F.2d 1282, 1286 (8th Cir. 1980) (although federal courts must "view pro se pleadings liberally, such pleadings may not be merely conclusory: the complaint must allege facts, which if true, state a claim as a matter of law").

Plaintiff's current complaint has been examined with these principles in mind.

## III. DISCUSSION

A. Segregated confinement and related restrictions

Defendants contend that Plaintiff cannot sustain a due process claim based on the

segregated confinement and the "level A and B" restrictions that allegedly were imposed by Defendants Schlank and Konieska. The Court agrees.

Because Plaintiff is being lawfully detained by the State of Minnesota, he does not enjoy the full range of constitutional rights and protections that he would if he were not so confined. Bell v. Wolfish, 441 U.S. 520, 546 (1979) ("[a] detainee simply does not possess the full range of freedoms of an unincarcerated individual"). Although Bell considered the rights of pre-trial detainees, rather civilly committed detainees, the Court finds the principles discussed in Bell to be fully applicable here.[3]

In Bell, the Supreme Court held that punitive sanctions cannot be imposed on pre-trial detainees unless they are first afforded the procedural protections of due process. 441 U.S. at 535 ("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"). However, the Court also pointed out that not every action affecting a pre-trial detainee can be considered a form of punishment that implicates due process concerns. The Court explained that "'[t]here is, of course, a de minimis level of imposition with which the Constitution is not concerned.'" Id. at 539, n. 21, quoting Ingraham v. Wright, 430 U.S. 651, 674 (1977).

In this case, Plaintiff's complaint does not describe any sanctions that exceed the "de minimis" threshold. Plaintiff has alleged that he was subjected to "level A" and "level B" restrictions, but there are no allegations suggesting that those restrictions caused him

[3] Indeed, it could be argued that pre-trial detainees should be given greater due process protections than those given to civilly committed detainees, because pre-trial detainees usually are being detained after receiving only a probable cause hearing, while civilly committed detainees, (such as Plaintiff), usually have received the benefit of a much more comprehensive hearing.

any meaningful hardship. And even if those restrictions were harsher than the complaint seems to imply, they only lasted for a total of three days. Plaintiff also has alleged that he was placed in "protective isolation," (presumably a form of segregated confinement), but there are no allegations suggesting that he was there for any significant length of time.[4] Plaintiff may have been unhappy about his segregated confinement and his level A and B restrictions, but he has alleged no facts suggesting that those "sanctions" exceeded Bell's de minimis standard.

In Smith v. Copeland, 87 F.3d 265 (8th Cir. 1996), a county jail inmate alleged that he had been placed in segregated confinement for four days. He further alleged that the toilet in his isolation cell overflowed, and "that he was 'made to endure the stench of [his] own feces and urine'" during his entire stay in segregated confinement. Id. at 268. Although the conditions described in Smith are much more abhorrent than anything described in Plaintiff's complaint, the Eighth Circuit found Smith's due process claim to be inadequate, as a matter of law. The Court held that the conditions described by Smith amounted to no more than "a de minimis imposition" that did not "implicate constitutional concerns." Id.

Given that the conditions described in Smith were found to have no constitutional significance, the Court concludes that the same must be true here as well. Because Plaintiff has failed to allege any facts showing that his segregated confinement and level A and B restrictions exceeded the de minimis threshold discussed in Bell and Smith, he

---

[4] Given that the level A and B restrictions lasted only a few days, it can reasonably be inferred -- in the absence of any specific allegations to the contrary -- that the related protective isolation restriction lasted for a similar length of time.

cannot sustain a due process claim based on those alleged sanctions.

B. Telephone and mail restrictions

Plaintiff also claims that his constitutional rights were violated by reason of the telephone and mail restrictions allegedly imposed by Defendants Schlank and Konieska. Again, the Court disagrees.

Defendants contend that although Plaintiff is not currently incarcerated as punishment for a crime, his custody status is in many ways similar to that of a prison inmate. He has been deprived of his liberty and taken into state custody based on evidence showing that he would likely pose a danger to others if he were allowed the full range of normal freedoms. Defendants contend that in light of Plaintiff's proven potential danger, they have the same security concerns as state correctional officials, and they must therefore have a comparable ability to deal with those concerns. The Court finds this argument to be persuasive. See Martyr v. Mazur-Hart, 789 F.Supp. 1081 (D.Or. 1992) (confinement of a civilly committed individual in a state hospital "is analogous to the confinement of a felon in a prison," and as far as such individuals are concerned, a state hospital "has the same security goals as a prison"); see also Dekart v. Milczark, No. C4-98-733 (Minn.App. 1998) 1998 WL 644255 (unpublished opinion) at * 2 (holding that constitutional rights of civilly committed individuals are subject to "institutional restrictions" that are "'reasonably related to therapeutic interests of the patients'"), quoting Martyr, 789 F.Supp. at 1085. Therefore, even though Plaintiff is not currently serving a prison sentence, the Court concludes that his constitutional rights are subject to essentially the same restrictions and limitations that can be applied to prison inmates.

"[I]t is well established that intrusions into a prisoner's personal mail for security reasons do not contravene the strictures of the Constitution." Bumgarner v. Bloodworth, 768 F.2d 297, 301 (8th Cir. 1985). "The United States Supreme Court has repeatedly allowed inspection of personal mail where 'the legitimate government interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence.'" Id., quoting Procunier v. Martinez, 416 U.S. 396, 412-13 (1974). Our Court of Appeals has stated quite clearly and succinctly that "the mere inspection of nonlegal incoming and outgoing mail poses no threat to [inmates'] civil rights." Jensen v. Klecker, 648 F.2d 1179, 1181, 1182 (8th Cir. 1981) (per curiam).

The telephone privileges of confined individuals are also subject to reasonable restrictions. State officials may impose "rational limitations" on telephone access, which are consistent with an institution's legitimate security interests. Benzel v. Grammar, 869 F.2d 1105, 1108 (8th Cir.), cert. denied, 493 U.S. 895 (1989). Simply put, "[a] prisoner has no right to unlimited telephone use." Id. See also Smith v. Copeland, 892 F.Supp. 1218, 1227 (E.D.Mo. 1995) (same), aff'd, 87 F.3d 265 (8th Cir. 1996).

With these principles in mind, the Court finds, as a matter of law, that Plaintiff's complaint does not describe any restrictions on his mail or telephone privileges that would support an actionable civil rights claim. It is readily apparent from the complaint itself that Defendants had good cause to believe that Plaintiff was abusing his mail and telephone privileges. The Chief Operating Officer of the MSOP, Defendant Harry, had allegedly received information from a California police department, which indicated that Plaintiff -- a previously convicted sex offender – had been engaged in "phone sex" with a young teenage girl. It appears that Plaintiff also may have been sending presents to the girl,

(presumably through the mail), and that Plaintiff may have received nude photographs of the girl, (presumably through the mail). Given those serious accusations, from a credible source, and given Plaintiff's history of abusing teenage girls, Defendants probably would have been remiss if they had not imposed some restrictions on Plaintiff's telephone and mail privileges.

Moreover, it is readily apparent from the complaint itself that the restrictions imposed on Plaintiff's telephone and mail privileges were reasonably related to legitimate security and therapeutic concerns. Defendants did not terminate Plaintiff's telephone and mail privileges altogether; they simply took sensible steps to monitor the content of his communications. To facilitate the monitoring of his telephone conversations, Plaintiff was permitted to place and receive only a limited number of calls per day, he was required to speak in English, and he was required to let MSOP personnel overhear what he said. Plaintiff's incoming and outgoing mail was inspected to ensure that he was not using the mail for inappropriate purposes -- e.g., to solicit sexual relations with minors.

In sum, the Court is satisfied that no rational judge or jury could properly conclude that the telephone and mail restrictions allegedly imposed by Defendants were unreasonable under the circumstances described in the complaint. Therefore, Plaintiff cannot bring a § 1983 civil rights action based on those alleged restrictions.

C. Self-incrimination claim

Plaintiff further claims that Defendants Schlank and Konieska violated his Fifth Amendment rights by compelling him to testify against himself. The Court finds, however, that the factual allegations in the complaint do not support that claim.

Although Plaintiff alleges that Defendants questioned him about the accusations made by the San Jose Police Department, there are no allegations suggesting that Defendants made any effort to compel Plaintiff to admit to any crime. Plaintiff contends that Defendants imposed various restrictions on him, (i.e., segregated confinement, the level A and B restrictions, and the limitations on his telephone and mail privileges), but there are no allegations suggesting that those restrictions were imposed for the purpose of compelling Plaintiff to confess to a crime. To the contrary, it is evident that those restrictions were imposed in an effort to ensure that Plaintiff (a) did not commit any future crime, (b) did not cause any future threat to institutional security, and (c) did not harm his own future chances for therapeutic rehabilitation. Because there are no factual allegations showing that Defendants actually sought to compel Plaintiff to incriminate himself, the complaint fails to state an actionable Fifth Amendment civil rights claim.

Furthermore, it is highly doubtful that Plaintiff could sustain a § 1983 claim based on an alleged violation of his Fifth Amendment rights, even if Defendants had tried to compel him to give them incriminating evidence. The federal courts have generally held that a Fifth Amendment violation does not occur unless and until an unlawfully compelled admission is used as evidence at a criminal trial. See United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990) ("[a]lthough conduct by law enforcement officials prior to trial may ultimately impair [the right against self-incrimination], a constitutional violation occurs only at trial"); Wilkins v. May, 872 F.2d 190, 194 (7th Cir. 1989) ("[t]he Fifth Amendment does not forbid the forcible extraction of information but only the use of information so extracted as evidence in a criminal case"), cert. denied, 493 U.S. 1026 (1990); Grooms v. Marshall, 142 F.Supp.2d 927, 936-37 (S.D.Ohio 2001) (dismissing § 1983 Fifth Amendment claim where

alleged self-incriminating statements were never used against the plaintiffs at trial); see also Warren v. City of Lincoln, Neb., 864 F.2d 1436, 1441 (8th Cir.) ("the remedy for a Miranda violation is the exclusion from evidence of any compelled self-incrimination, not a section 1983 action"), cert. denied, 490 U.S. 1091 (1989).[5]

In this case, it appears that Plaintiff never actually made any self-incriminating statements in response to the alleged questioning by Schlank and Konieska. And it certainly is clear that their alleged questioning did not produce any evidence that was (or ever could be) used against Plaintiff at any criminal trial. Thus, the Court concludes that Plaintiff could not sustain a § 1983 Fifth Amendment claim, even if he could show that Defendants actually did try to force him to provide self-incriminating evidence.

D. Claims against Defendant Harry

So far, the Court has considered only Plaintiff's claims against Defendants Schlank and Konieska, who allegedly imposed the various restrictions at issue in this case. However, Plaintiff also is attempting to sue Defendant Harry, claiming that Harry approved the restrictions allegedly imposed by Schlank and Konieska, and that Harry is therefore ultimately liable (with Schlank and Konieska) for the constitutional violations allegedly caused by those restrictions. Given the Court's determination that the restrictions described in the complaint are not actionable under § 1983, (for the reasons discussed above), it follows that Plaintiff has no actionable § 1983 claim against Harry.

---

[5] While the law on this subject may not be universally consistent, (see e.g., Cooper v. Dupnik, 963 F.2d 1220 (9th Cir.) (en banc), cert. denied, 506 U.S. 953 (1992)), there is more than enough case law on Defendants' side of the issue to support a qualified immunity defense to Plaintiff's self-incrimination claim. Giuffre v. Bissell, 31 F.3d 1241, 1256 (3rd Cir. 1994).

E. Claims pertaining to "legal telephone calls"

Plaintiff's final two claims are brought against Defendant Debbie James. One of those claims is based on allegations that James prevented Plaintiff from making "legal telephone calls" on two occasions. Plaintiff apparently is contending that James deprived him of his constitutional right of access to the courts, (see Bounds v. Smith, 430 U.S. 817 (1977)), by not allowing him to use a telephone to call a lawyer on the two occasions described in the complaint. This claim is clearly unavailing.

To plead an actionable claim for denial of access to the courts, the complainant must allege facts showing that (a) he was deprived of the necessary means to present his claims or defenses in court, and (b) he suffered some "actual injury" as a result of that deprivation. Lewis v. Casey, 518 U.S. 343, 150-53 (1996). Plaintiff's complaint does not include any factual allegations that would satisfy either of these requirements.

First, there are no allegations showing that James actually deprived Plaintiff of access to legal assistance. To the contrary, it plainly appears that James merely informed Plaintiff that he could not make a call "on demand," and that he would have to wait until MSOP personnel were available to make sure that the call was properly placed. Nothing in the complaint suggests that Plaintiff was completely cut off from the resources he needed to preserve his legal rights. See Aswegan v. Henry, 981 F.2d 313, 314 (8th Cir. 1992) ("prisoners do not have a right to any particular means of access [to the courts], including unlimited telephone use..."; they are only entitled to "access that is adequate, effective, and meaningful when viewed as a whole").

In addition, there are no allegations showing that Plaintiff suffered any "actual injury" to his substantive legal rights as a result of either of the two incidents described in his

complaint. The absence of any allegations of actual injury is a second fatal defect in Plaintiff's access to the courts claim. See McMaster v. Pung, 984 F.2d 948, 953 (8th Cir. 1993) (prisoner's access to the courts claim, based partially on telephone restrictions, was properly dismissed, because prisoner failed to show "prejudice or actual injury as a result of the prison officials' conduct").

Thus, the Court concludes that Plaintiff cannot sustain a § 1983 claim against Defendant James based on the two isolated instances when he allegedly was unable to place legal phone calls on demand.

F. Claims pertaining to the withholding and destruction of mail

The last claim to be considered is based on Plaintiff's allegations that Defendant James destroyed one piece of his outgoing mail, and has been withholding one piece of his incoming mail. Defendants have made no effort to explain why this claim should be dismissed, and the Court is not prepared to recommend that the claim be dismissed sua sponte. As discussed above, Plaintiff does not have an unfettered constitutional right to send and receive mail during his MSOP confinement. That does not necessarily mean, however, that MSOP officials can arbitrarily withhold or destroy mail. Defendant James may have a valid defense to Plaintiff's claim pertaining to the allegedly withheld and destroyed pieces of mail, but she not presented any such defense here. Therefore, to the extent that Plaintiff is attempting to sue Defendant James for withholding and destroying his mail, it will be recommended that the motion to dismiss be denied at this time.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendants' motion to dismiss, (Docket No. 5), should be GRANTED IN PART AND DENIED IN PART;

2. All of Plaintiff's claims against Defendants Rick Harry, Anita Schlank and Deborah Konieska should be dismissed;

3. Plaintiff's claims against Defendant Deborah James based on alleged interference with Plaintiff's legal telephone calls should be dismissed; and

4. Plaintiff's claims against Defendant Deborah James based on the alleged withholding and destruction of Plaintiff's mail should not be dismissed at this time.

Dated: December 20th, 2002

ARTHUR J. BOYLAN
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before January 3, 2003.